# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
DISTRICT OF COLUMBIA,       )
        )
     Plaintiff,     )
        )
    v.      )     Civil Action No. 13-0730 (ABJ)
        )
DEPARTMENT OF LABOR, *et al.*,   )
        )
     Defendants.    )
_____)

_____

)
CCDC OFFICE LLC,      )
        )
     Plaintiff,     )
        )
    v.      )     Civil Action No. 13-0737 (ABJ)
        )
U.S. DEPARTMENT OF LABOR*, et al.*,  )
        )
     Defendants.    )
_____)

## <u>MEMORANDUM OPINION</u>

This case poses the question of whether the "CityCenterDC" project, the redevelopment of the old Washington Convention Center site, is a "public work" for purposes of the Davis-Bacon Act, 40 U.S.C. § 3141 *et seq.* ("DBA" or "the Act").  The District has entered into a series of agreements to lease the land to private developers to construct a mixed-use development that will feature condominium and apartment buildings, two office buildings, a hotel, retail establishments, and some public open spaces.  Although the project will sit on a parcel of land owned by the District of Columbia, it will be entirely privately funded, occupied, and maintained for the duration of the developers' ninety-nine year leases with the city.

Despite the predominantly private nature of this development, the Department of Labor's Administrative Review Board ("ARB") has concluded that CityCenterDC constitutes a "public work" within the meaning of the Davis-Bacon Act.[1] This designation requires that workers on the project be paid prevailing wages as determined by the Department of Labor ("DOL" or "the Department") under the Act.[2] The ARB found the project to be a "public work" because of the District's involvement in planning and oversight, and in light of the public benefits expected to flow from the development, including employment opportunities for District residents, a set of affordable housing units, new sidewalks, pedestrian friendly areas, and increased lease and tax revenue for the District.

Plaintiffs the District and CCDC Office LLC ("CCDC") filed this action to challenge the ARB's determination. They argue that the decision to apply the DBA to CityCenterDC conflicted with the plain language of the DBA, was arbitrary and capricious, and should be set aside under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Defendants contend that the term "public work" is ambiguous and that the agency's decision rested on a permissible interpretation of the Act and the Department's own regulations. A labor organization and several individual workers have intervened as defendants and brought a counter-claim against plaintiffs,

---

1       Defendants filed the administrative record for this case on January 8, 2014. *See* J.A. of Admin. R. Exs. Relied Upon by the Parties with Respect to Dispositive Mots. [Dkt. # 54]. When referring to a document in the administrative record, the Court will use "AR" and the Bates number of the document.

2       Notably, the ARB did not decide who would be responsible for paying any increase in wages. AR 3247 n.12.

arguing that plaintiffs' failure to implement the ARB's ruling constitutes a deprivation of their rights. All parties have moved for summary judgment.

This appears to be a case of first impression. The parties acknowledge that the Act has never before been applied to a development that is entirely privately financed and constructed, and built primarily for private use. It may be true that the District has been more involved in this project than in a typical condominium or hotel construction project, but that is a feature of the size and mixed-use nature of the project and the fact that the District owns the land. When one considers the plain language of the Davis-Bacon Act and the history and purpose of the statute, it becomes clear that Congress did not intend the term "public work" to embrace a large-scale private development like CityCenterDC, which will be neither built nor used by the government or the public. This conclusion is also consistent with the Department's own administrative decisions interpreting the Act.

At bottom, there are two signature elements of a public works project: public dollars going into the project, and a public facility coming out of the project. CityCenterDC has neither. It is being privately financed by for-profit entities, and it will result in the creation of condominiums, apartments, office space, retail space, and a hotel that will be privately owned and operated. The fact that the project is expected to give rise to incidental public benefits – such as employment opportunities, increased tax revenue, and even a certain amount of open space – does not transform it into a public work; these are the goals of *every* urban development project. And the fact that the District has imposed certain requirements – even some at the level of particularity of the width of the sidewalks – does not alter the essence of the finished product.

The ARB's reliance on these details ignores the big picture: that the project is not being built by the government, for the government, or for the people the government represents.

The CityCenterDC development may be a laudable and exciting public-private partnership, and it may entail a more comprehensive level of urban planning and cooperation than the ordinary project, but the exercise will result in the creation of an enclave of private facilities. What is being constructed will be no more for the use and benefit of the population of the District than any other condominium or hotel: members of the general public will be welcome to enjoy the surrounding sidewalks, and possibly the lobby, and they can spend their dollars in the nearby shops and restaurants, but at the end of the day, they will not be permitted to go upstairs. CityCenterDC is not a public work of the District of Columbia, and the ARB's decision to the contrary cannot be sustained.

## BACKGROUND

### I. The CityCenterDC Development Project

In July 2001, a District-convened task force recommended that the site of the old Washington Convention Center be transformed "into a mixed-use urban neighborhood." AR 2603. With the approval of the Council of the District of Columbia ("City Council"), the city issued a "Request for Proposals for a Development Partner" ("RFP") in September 2002, seeking a master developer to undertake the project. *Id.* The District sought "to identify a potential partner with whom it could collaborate over a protracted period of time to develop the area with a mix of appropriate civic, residential, cultural, retail, and entertainment offerings" and who "shared the same vision as the District" as to the use of the site. AR 2705. The RFP included a document called "Envisioning the Site: A Preliminary Design Guideline." AR 2603.

After considering the responses to the RFP, the District executed an "Exclusive Rights Agreement and Land Disposition Agreement" ("ERA") with its chosen master developer, Hines Interests Limited Partnership and Archstone-Smith Operating Trust ("Developers"), in May of 2005.[3] *See* AR 2603–99 (ERA document). The ERA required Developers to prepare a "master plan" for development of the site. AR 2627. The master plan was to include a "Development Program" specifying the "nature and scope of all uses" of the land, including:

- Common areas designed "to be a one-of-a-kind pedestrian friendly destination with extensive public art, signage, landscaping, street furnishings, fountains, pedestrian lighting and inviting spaces for programmable community events and gatherings," as well as "[a] public plaza of approximately one acre." AR 2629–30. These areas were to feature "the highest quality, above market standard finishes, streetscapes and fountains," comparable in quality and expense to "Rockefeller Center, Bethesda Row and Beursplein Promenade in Rotterdam." AR 2632.

- Rental and for-sale residential units. The District specified the number of each kind of residence and the approximate percentage mix of efficiency, one-bedroom, and two-bedroom units. It also set aside a specific percentage of units as affordable housing. AR 2630.

- Approximately 300,000 square feet of retail space, which the District had the "sole discretion" to reduce on certain parcels of land. AR 2630–31.

- A "boutique hotel" to be built "[a]t the District's option." AR 2631.

- A "Convention Center Headquarters Hotel" to be built "[a]t the District's option." *Id.*

- A central library to be built "[a]t the District's option." AR 2632.

- Public parking "of approximately 850 spaces." *Id.*

---

3      There have been many developers involved with CityCenterDC, including plaintiff CCDC, the developer for the office building portion of the project. For the sake of clarity, the Court will refer to these entities as "Developers."

The District retained the right to approve "[a]ny architects, planners, engineers, landscape architects, attorneys and other professionals or consultants that actively and substantially participate in the Master Plan process," with the exception of certain "Key Professionals,"[4] and with the caveat that District approval would not be withheld unreasonably. AR 2633. The ERA also provided that the "Development Agreement [would] address the extent to which Davis-Bacon Act requirements appl[ied] to the construction" of the project. AR 2681.

The City Council approved the ERA on June 7, 2005. AR 1651. As part of that process, it also passed a resolution that day, declaring that the site of the old Washington Convention Center was "no longer required for public purposes." Ex. 2 to Pl.'s Mot. for Summ. J. [Dkt. # 22-4] ("District's Mot."). Thereafter, the District approved Developers' final "Master Plan." AR 2112.

In December 2007, the District and Developers entered into an "Amended and Restated Development Agreement and Land Disposition Agreement" ("RDA"), which superseded all previous agreements. AR 2076–2177. Under the RDA, the District reserved the right to:

- Approve in writing certain architects and design professionals not already pre-approved. AR 2128.

- Approve certain design documents, including "Schematic Drawings," "Design Development Drawings," "[c]onstruction drawings," "[b]id documents," and "[p]re-approved for-construction Plans and Specifications." AR 2128–29. The District would also participate in monthly meetings with Developers during the preparation of these documents. AR 2129.

---

4    "Key professionals" are defined in the ERA as those "professionals and consultants" that Developers had committed to use from the outset. AR 2621.

- Approve in writing "Significant Changes to Plans and Specifications or Permits agreements approved by [the] District," with the caveat that approval would not be withheld unreasonably.[5] AR 2133.

- Review and approve the choice of general contractors and general construction contracts for the office, residential, common area, and parking elements of the development project, with approval not to be withheld unreasonably. AR 2134.

- Enter and inspect the project site on two business days' notice during regular business hours, at any time after an uncured "Event of Default" by a Developer party, or in case of emergency. AR 2135.

- Use, at the District's expense, "a construction manager or other consultant to assist District" in reviewing the construction and development-related materials and with inspections of the development and construction process. AR 2136.

- Receive monthly progress reports from Developers. *Id.*

- Inspect or audit Developers' books and records for the project. AR 2137.

The District also retained the power to terminate the agreement in the event of uncured "Events of Default," including the nonpayment of required funds, the failure to perform obligations under the RDA, and the failure to achieve certain "Milestone Events."[6] AR 2163– 64. The RDA incorporated agreements by Developers and the District to ensure that "local, small, and disadvantaged business enterprises" would benefit from the new development, and that fifty-one percent of jobs created by the project would go to residents of the District. AR

---

5      The agreement defines "Significant Changes" to be changes in "any material respect" to the major elements of the project such as building construction and design, pedestrian areas, and landscaping. AR 2100–01.

6      The relevant "Milestone Events" were the completion of ground leases, the lease guaranty, and for-sale covenants; all zoning approvals; closing; the completion of bid documents; the escrow release date; and construction commencement. AR 2126–27.

2139, 2141; Mem. in Supp. of Pl.'s Mot. for Summ. J. at 5 [Dkt. # 22-1] ("District's Mem."). Notwithstanding the provision in the ERA that the development agreement would address whether the Davis-Bacon Act applied to the project, the RDA was silent on the question.

To implement the development agreement, the District has entered into three concurrent ninety-nine-year ground leases with a "residential rental tenant," AR 1815, a "retail ground tenant," AR 1947, and an "office tenant." AR 1683.[7] The ground leases refer to the Development Agreement between the District and Developers, AR 1705, 1837, 1970, and they call for the payment of approximately $2 million in annual rent to the District. AR 1696, 1828, 1960. The leases require the tenants to maintain the development to "First-Class Standards," AR 1723, 1855, 1988, and to surrender the property to the District at the termination of each lease. AR 1752, 1883, 2020. The RDA also provided that the district would convey the land used for the construction of for-sale residential units in fee simple. AR 1942. Finally, the District would convey the land for the park by license agreement for twenty years. District's Mem. at 4.

The CityCenterDC development project is now under construction. *See* CityCenterDC Construction Progress, http://www.citycenterdc.com/construction-progress (last visited Mar. 29, 2014). The project is expected to meet green building standards and to encompass 515,000 square feet of office space, 295,000 square feet of retail space, 458 rental apartment units, 216 for-sale condominium units, a 350-room hotel, 1,885 underground parking spaces, and 1.5 acres

---

7     The Joint Appendix does not contain executed versions of the residential or retail leases. On March 22, 2011, the District and plaintiff CCDC signed the office lease. AR 2791.

of "public spaces," including a park and a plaza.[8]  *See* CityCenterDC Project Details, http://www.citycenterdc.com/project-details (last visited Mar. 29, 2014).  There will be no library.  *See id.*  In addition, the intersection of 10th and I Streets, Northwest, has been reopened. Hr'g Tr., Jan. 15, 2014 at 8 [Dkt. # 55]; *see also* Aaron C. Davis, *City Street in D.C. Reopens After 34 Years*, Wash. Post, Dec. 15, 2013, http://www.washingtonpost.com/local/dc-politics/city-street-in-dc-reopens-after-34-years/2013/12/15/23c7136e-6373-11e3-91b3-f2bb963 04e34_story.html.  None of the buildings, parking spots, or "public spaces" will be occupied, used, or managed by the District of Columbia.  AR 1028–29.  And, all of the parties have agreed that the District is not funding the development, and private parties will own and occupy the structures for the duration of Developers' leases.

## II.    Procedural Background

The Davis-Bacon Act states:

> The advertised specifications for every contract in excess of $2,000, to which the Federal Government or the District of Columbia is a party, for construction . . . of public buildings and public works of the Government or the District of Columbia . . . and which requires or involves the employment of mechanics or laborers shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics.

40 U.S.C. § 3142(a).  The DBA requires that such contracts contain minimum wage provisions based on the prevailing wage rates set by the Secretary of Labor.  *Id.* § 3142(b).

---

8    The term "park" is used somewhat loosely to refer to a completely paved triangular island, bordered by New York Avenue, that features a fountain and is dotted with tree boxes. *See* Artist's Rendering of CityCenterDC Park, http://www.citycenterdc.com/overview (follow "View slideshow" hyperlink; then search for image twelve).

On April 14, 2008, the Mid-Atlantic Regional Council of Carpenters ("MARCC") asked the District's Deputy Mayor for Planning and Economic Development, Neil O. Albert, to "advise [them] of the District of Columbia's position with respect to whether the Davis-Bacon Act applies to the development of the former Washington Convention Center site."[9]  AR 1596–97. Deputy Mayor Albert replied to MARCC's inquiry on May 1, 2008, explaining that the District did not believe the DBA applied to the project because "the District will not be a party to any construction contracts, the project to be built will not be owned by the District and no District funds will be used to pay construction costs."  AR 1598.  MARCC responded by letter on May 22, 2008, requesting further elaboration upon the District's position.  AR 1599–1603.   In a letter dated June 23, 2008, Deputy Mayor Albert reiterated the District's position that the DBA did not apply.  AR 1605.

On April 25, 2009, MARCC requested a ruling from the Acting Administrator of the Wage and Hour Division ("WHD") of the Department of Labor as to whether the DBA applied to the project.  AR 1576.  The District sent a letter to the Acting Administrator setting forth its position that the DBA did not apply to the project on May 27, 2009.  AR 1572–74.  On August 30, 2010, the DOL's Chief of the Branch of Government Contracts in the Division of Enforcement Policy ("Branch Chief") announced his conclusion that the DBA did not apply to the project.  AR 1026–29.  The Branch Chief found that, although the District and Developers had "contracted for construction through the City Center project arrangements," AR 1027, the

---

9        It appears from the administrative record that MARCC had also previously made this request on March 20, 2008, and April 2, 2008, but had not yet received a response.  AR 1596.

DBA did not apply because the project was neither a public building nor a public work. AR 1028–29.

MARCC requested reconsideration of the Branch Chief's decision on October 29, 2010. AR 0892. The then-Acting Administrator ("Administrator") of the WHD issued a final ruling on June 17, 2011, that reversed the Branch Chief and found that the DBA did apply to CityCenterDC. AR 0834. The Administrator agreed with the Branch Chief that the CityCenterDC agreements together constituted a "contract for construction," and determined that the project was a "public work" as defined by DOL's regulation, 29 C.F.R. § 5.2(k) (2013). AR 0837–38. Accordingly, the Administrator ordered that all existing, relevant agreements be amended as necessary to comply with the DBA and that the prevailing wage requirement would apply prospectively following the ruling. AR 0841. The Administrator went on to state in a footnote that "[t]he District, not Developers, [was] responsible for any increased wage and fringe benefit costs resulting from application of the DBA to the City Center project." AR 0836 n.1.

The District, CCDC, and MARCC all appealed to DOL's Administrative Review Board, which issued a final agency decision affirming the Administrator's decision on April 30, 2013.[10] AR 3231–48. While that appeal was pending, MARCC, Pedro Angulo, and Eric Schultz filed suit in this Court seeking declaratory and injunctive relief for alleged violations of their rights

_____

10    The District and CCDC sought reversal of the Administrator's determination that the DBA applied to the CityCenterDC project, and MARCC asked the ARB to reverse the Administrator's decision to apply the DBA's requirements only prospectively. AR 3239.

under the DBA.[11] *See Angulo v. Gray*, 907 F. Supp. 2d 107, 107 (D.D.C. 2012).  On December

3, 2012, the Court dismissed their complaint because the issue was still pending before the ARB.

*Id.* at 111. Then, on April 30, 2013, the ARB upheld the Administrator's finding that the set of

CityCenterDC agreements constituted a "contract for construction" within the meaning of the

DBA and agreed with the Administrator that, under the DOL's regulations, the project was a

"public work."  AR 3240, 3242.  Finally, the ARB held that the issue of who would be liable for

any increased costs was "not ripe for decision" and "not properly before" the Board.[12]  AR 3247

n.12.

On May 20, 2013, the District brought this action against defendants DOL, Seth D.

Harris, in his official capacity as Acting Secretary of DOL, and Mary Beth Maxwell, in her

official capacity as Acting Deputy Administrator of the WHD.  Compl. at 1 [Dkt. # 1].  On May

21, 2013, plaintiff CCDC filed a separate suit against the same defendants, as well as defendant

ARB.[13]  *CCDC Office LLC v. DOL*, No. 13-cv-737 (D.D.C. filed May 21, 2013).  Both plaintiffs

ask the Court to hold unlawful and set aside the ARB's decision, which is a final agency action,

under the APA.  District's Mem. at 1; Pl. CCDC Office LLC's Mem. in Supp. of Dispositive

---

11      MARCC, Angulo, and Schultz are intervenor-defendants in this case.  Angulo and
Schultz, along with intervenor-defendant Finley, have previously been employed as workers on
the CityCenterDC project.  Intervenor-Defs.' Answer to Compl., Affirmative Defenses &
Countercl. at 14–15 [Dkt. # 25] ("Intervenor-Defs.' Countercl.").

12      The ARB also held that the Administrator had not abused her discretion when she applied
the DBA to all existing contracts and ordered only prospective relief.  AR 3247.

13      The Court will refer to the DOL, the Acting Secretary, the Acting Deputy Administrator,
and the ARB collectively as the "federal defendants."

Mots. at 1 [Dkt. # 29-1] ("CCDC's Mem."). The Court granted the federal defendants' unopposed motion to consolidate the two cases, [Dkt. # 21], on August 12, 2013, [Dkt. # 24].

MARCC, Pedro Angulo, Eric C. Shultz, and Thomas L. Finley ("intervenor-defendants") moved to intervene in this case on July 31, 2013, [Dkt. # 18], and the Court granted that motion on August 12, 2013, [Dkt. # 23]. That same day, intervenor-defendants filed their answer to the District's complaint and their counterclaim, [Dkt. # 25].

All parties have moved for summary judgment. *See* District's Mot.; Pl. CCDC Office LLC's Mot. to Dismiss or, in the Alternative, for Summ. J., the Intervenor-Defs.' Countercl. [Dkt. # 29]; Pl. CCDC Office LLC's Mot. for Summ. J. [Dkt. # 30]; Pl.'s Mot. to Dismiss or, in the Alternative, for Summ. J. on the Intervenor-Defs.' Countercl. [Dkt. # 31]; Fed. Defs.' Cross-Mot. for Summ. J. & Opp. to Pls.' Mots. for Summ. J. [Dkt. # 37]; Intervenor-Defs.' Mot. for Summ. J. in Favor of Their Countercl. [Dkt. # 39]. In addition, the Associated Builders and Contractors, Inc. filed an *amicus* brief on behalf of both plaintiffs. Br. *Amicus Curiae* of Assoc. Builders & Contractors, Inc. in Supp. of Pls. [Dkt. # 51]. The Court heard oral argument on these motions on January 15, 2014.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.*; *see also Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Washington Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982), *abrogated on other grounds by Berger v. Iron Workers Reinforced Rodmen*, 170 F.3d 1111 (D.C. Cir. 1999). In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

Whether the ARB correctly concluded that the Davis-Bacon Act applies to the CityCenterDC project is a question of law that the Court may properly decide on summary judgment. The Court is required to analyze an agency's interpretation of a statute under the two-step procedure set forth in *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). First, the Court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the

14

matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. Courts "use 'traditional tools of statutory construction' to determine whether Congress has unambiguously expressed its intent," *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319 (D.C. Cir. 1998), quoting *Chevron*, 467 U.S. at 843 n.9, including an examination of the statute's text, structure, purpose, and legislative history. *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997).

If the Court concludes that the statute is either silent or ambiguous on the question to be decided, the second step of the review process is to determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Once a court reaches the second step, it must accord "considerable weight" to an executive agency's construction of a statutory scheme it has been "entrusted to administer." *Id.* at 844. In addition, a court must defer to an agency's reading of its own regulations unless it is "plainly erroneous or inconsistent with the regulation." *Serono Labs.*, 158 F.3d at 1320 (internal quotation marks omitted).

I. **The first step of the *Chevron* test indicates that the DBA does not apply to CityCenterDC.**

The Davis-Bacon Act provides:

The advertised specifications for every contract in excess of $2,000, to which the Federal Government or the District of Columbia is a party, for construction . . . of public buildings and public works of the Government or the District of Columbia . . . and which requires or involves the employment of mechanics or laborers shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics.

40 U.S.C. § 3142(a). The DBA is, "'[o]n its face, . . . a minimum wage law designed for the benefit of construction workers.'" *Univs. Research Ass'n v. Coutu*, 450 U.S. 754, 771 (1981),

quoting *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 178 (1954). But the Act does not apply to all construction projects in all circumstances. Rather, it governs "every contract in excess of $2,000, to which the Federal Government or the District of Columbia is a party" for "construction, alteration, or repair . . . of public buildings and public works of the Government or the District of Columbia." 40 U.S.C. § 3142(a). All parties in this case agree that the DBA has never before been applied to a project that, like CityCenterDC, is privately financed, privately owned, and privately maintained. Based upon the plain language of the statute, as well as its history and purpose, the Court finds that Congress did not intend that the DBA would apply to a private project like CityCenterDC, and so, the ARB's decision must be set aside.

**A.  CityCenterDC is not a "public work."**

The DBA was enacted by Congress during the Great Depression to address "the economic conditions of the early 1930's," in particular, the surplus of available workers at the time. *Coutu*, 450 U.S. at 774. Congress sought "to combat the practice of 'certain itinerant, irresponsible contractors, with itinerant, cheap, bootleg labor . . . going around throughout the country'" and driving down wages. *Id.*, quoting 74 Cong. Rec. 6510 (1931) (testimony of Rep. Bacon). Given the "increased . . . importance of federal building programs," and the fact that "private construction was limited" at the time, Congress enacted the DBA "simply to give local labor and the local contractor a fair opportunity to participate in this building program." *Id.*, quoting 74 Cong. Rec. 6510 (testimony of Rep. Bacon).

Thus, even though Congress did not define "public work" in the DBA, it is clear from the history and purpose of the legislation that Congress did not intend that term – or the Act – to apply to a private construction project. Congress enacted the DBA for the express purpose of

giving local workers and contractors a fair shot at participating in government-run building programs, as opposed to private construction projects, because there was not enough private construction to keep them employed. Indeed, members of Congress expressly envisioned that DBA-protected workers would be building such structures as "post offices and public buildings." *See id.* at 774 n.25, quoting 74 Cong. Rec. 6510 (testimony of Rep. Bacon).

Not long after the passage of the DBA, the Supreme Court emphasized that the term "public work" in a similar depression-era statute, the Miller Act,[14] was meant to convey a concept that is "not technical but plain and specific." *United States v. Irwin*, 316 U.S. 23, 30 (1942) (holding that the Howard University library, the construction of which was funded by Congress, constituted a "public work" under the Miller Act). Similarly, the Sixth Circuit held at the time that the definition of "public work" under the Heard Act, the predecessor of the Miller Act, was "without technical meaning and . . . to be understood in its plain, obvious and rational sense." *Peterson v. United States*, 119 F.2d 145, 147 (6th Cir. 1941).

This admonition went unheeded in this case once the dispute left the hands of the Branch Chief at the Department of Labor. The federal defendants characterize the task they undertook

---

14     The Miller Act, when enacted, required a contractor to put up a payment bond "before any contract, exceeding $2,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States" could be awarded. *Irwin*, 316 U.S. at 24–25, citing the Miller Act, ch. 642, 49 Stat. 793 (1935) (codified as amended at 40 U.S.C. § 3131(b) (2014)). That the Miller Act's language is virtually identical to the DBA's is no coincidence: the Miller Act was enacted by the same Congress that amended the DBA into substantially the same form it takes today, *see* Act of Aug. 30, 1935, ch. 825, 49 Stat. 1011 (1935); and the statutes are closely related, since "[u]nder provisions of the Davis-Bacon Act the remedy for a laborer who has not been paid at the minimum wage designated by the Secretary of Labor is the remedy provided under the Miller Act." *United States v. Douglas Constr. Co.*, 531 F.2d 478, 480 (10th Cir. 1976).

as a "fact-intensive" inquiry. Hr'g Tr. at 35. But the point of amassing and examining a set of details is to create a clear picture of the whole and to get at the essence of the matter, and these defendants lost the forest in the trees.

In the Court's view, the ARB's ruling fails at the first step of the *Chevron* analysis because the plain and obvious meaning of the statutory phrase "public buildings and public works" does not encompass a boutique hotel, a private office building, a condominium, or an apartment building, even an apartment building that reserves units to be rented – by private landlords to private tenants – at more affordable rates. The operative agreements in this case simply are not contracts for the construction of "public buildings or public works of" the District of Columbia, and therefore, the Davis-Bacon Act does not apply.

The Supreme Court provided some guidance in the *Irwin*, the Miller Act, case when it looked to the definition of a public work found in the National Industrial Recovery Act, ch. 90, 48 Stat. 195, 201 (1933): "[A]ny projects of the character heretofore constructed or carried on either directly by public authority or with public aid to serve the interests of the general public." 316 U.S. at 24; *see also id.* at 30. And in *Peterson*, the court defined a public work under the Heard Act as "any work in which the United States is interested and which is done for the public and for which the United States is authorized to expend funds." 119 F.2d at 147.

CityCenterDC is not being built with public aid, so that prong of the definition did not bear on the situation. But the ARB held that the development was being "carried on . . . directly by" the District's authority because: (1) "the terms of the ground leases, the development agreements, and the Master Plan collectively provide the District with authority over what will be built and how it will be maintained during the lease terms;" (2) the District "passed enabling

18

legislation authorizing redevelopment of the site and is a signatory to the prime contracts . . . and the three lease agreements that embody the terms for construction and incorporate the project's master plan;" (3) "but for the District's agreement to lease the land," CityCenterDC would not be built; (4) "[t]he District's Mayor conveyed this prime, downtown real estate for the purpose of redevelopment," with the approval of the City Council; (5) the District has the authority to require Developers to "construct or cause construction of improvements that meet with the terms of the Master Plan;" (6) the District "has authority over design particulars, over the Developers' selection of general contractors, and over any changes to the Master Plan;" and (7) the District "can terminate these leases in case of default."[15]  AR 3242–43.  Acknowledging "[t]he fact that the Developers are driven by private economic gains in this case," the ARB nevertheless went on to determine that the project is a "public work" because it "serve[s] the interests of the general public."  AR 3243–44.

But whether a project "serves" the public interest is not the test; both the *Irwin* definition and the Department's own definition provide that a "public work" is government construction

---

15     The parties differ on the question of whether the level of municipal involvement in the CityCenterDC project is unprecedented or unremarkable.  *Compare* Revised Mem. of P. & A. in Supp. of Fed. Defs.' Cross-Mot. for Summ. J. & Opp. to Pls.' Mots. for Summ. J. at 21–22 [Dkt. # 42] ("Fed. Defs.' Mem.") (stating the District has "gross[ly] minimize[ed]" its "unquestionably broad" authority over CityCenterDC), *with* Hr'g Tr. at 79 (testimony of plaintiff CCDC that the District's approval rights are "standard procedure" under "these [types of] land disposition agreements").  The Court has its doubts about whether the sort of comprehensive urban planning here meets the test set out in *Irwin*, which requires that the project be carried on "either *directly* by public authority or with public aid."  316 U.S. at 24 (emphasis added).  The contracts at issue in this case specify that the construction will be carried on directly by the private developers, with some oversight and approval rights accorded to the District.  But even if the ARB was correct in its reading of the "directly by public authority" requirement, the Court's finding that the project being carried on is not a public work means that the ruling cannot stand.

"*carried on . . . to serve* the interests of the general public."  *Irwin*, 315 U.S. at 30 (emphasis

added); *see also* 29 C.F.R. § 5.2(k) (same); *Peterson*, 119 F.2d at 147 (defining public work

under Heard Act as work "which is *done for* the public").[16]  The ARB predicates its

determination on an alteration of that definition that omits the critical connection and sense of

purpose conveyed by the use of the word "to."  In other words, the *Irwin* definition asks:  even if

the construction involves public authority or public aid, *why* was it undertaken?  Who or what is

the project being built *for?*  Neither the statute, nor the case law, nor the agency regulations

describe the relevant inquiry as whether some secondary public benefits might also flow from the

project.  The ARB posited that a "public work" need only benefit the public "in some manner."

AR 3244.  But this vague proposition finds no support in the text, structure, purpose, or

legislative history of the statute, *see Bell Atl.*, 131 F.3d at 1047, and it would expand the concept

---

16     Federal defendants argue that DOL's regulatory definition of "public work" controls in
this case, not the *Irwin* definition.  Fed. Defs.' Mem. at 20 n.8.  But the relevant portion of the
regulatory definition is identical to the language in *Irwin*.  *See* 29 C.F.R. § 5.2(k) ("The term
public building or public work includes building or work, the construction . . . of which . . . is
*carried on directly by authority of* or with funds of a Federal agency *to serve the interest of the
general public . . . .*") (emphasis added).  Moreover, the three agency decisions that the ARB
relied upon expressly state that the DOL's regulatory definition "appears to paraphrase the
holding in *Peterson*," and two of the three also cite the *Irwin* definition.  *In re Phx. Field Office,
Bureau of Land Mgmt.*, ARB Case No. 01-010, 2001 WL 767573, at *5 (Dep't of Labor June 29,
2001) (citing *Peterson* and *Irwin*); *In re Crown Point, Ind. Outpatient Clinic*, WAB Case No. 86-
33, 1987 WL 247049, at *4 (Dep't of Labor June 26, 1987) (citing *Peterson*); *In re Military
Hous., Ft. Drum, N.Y.*, 1985 WL 167239, at *5–6 (Dep't of Labor August 23, 1985) (citing
*Peterson* and *Irwin*).

of a public work so broadly as to render it inconsistent with the "plain and specific" meaning that

Congress intended when the law was enacted.[17] *See Irwin*, 316 U.S. at 30.

The Department of Labor relied upon a series of its own cases to justify its determination,

but all of the DBA cases cited by the ARB and by the defendants in their pleadings involve an

agreement between the government and a private developer to build structures that were to be

leased, used, and occupied by the government. *See In re Phx. Field Office, Bureau of Land*

*Mgmt.*, ARB Case No. 01-010, 2001 WL 767573, at *5 (Dep't of Labor June 29, 2001)

("*Phoenix Field Office*") (Bureau of Land Management ("BLM") storage facility); *In re Crown*

*Point, Ind. Outpatient Clinic*, WAB Case No. 86-33, 1987 WL 247049, at *4 (Dep't of Labor

June 26, 1987) ("*Crown Point*") (VA outpatient clinic), *aff'd sub nom. Bldg. and Constr. Trades*

*Dep't, AFL-CIO v. Turnage*, 705 F. Supp. 5, 6–7 (D.D.C. 1998); *In re Military Hous., Ft. Drum,*

---

17       The ARB pointed to the following public benefits of the project as evidence that it was a "public work" notwithstanding its primarily private purposes:  employment for District residents; affordable housing; the reintroduction of 10th and I Streets; the public "park," plaza, sidewalks, alleys, and walkways; and "substantial revenues to the District." AR 3244.  But providing local jobs and tax revenue are the desired outcome of *any* development project; those factors do not necessarily mark the differentiation between a private project and a public work.  And it is not unusual that private construction might entail compliance with other city-imposed requirements as a condition of approval.  *See* D.C. Code § 10-801 (2012) (authorizing the Mayor of the District of Columbia to dispose of District-owned real property pursuant to numerous requirements, including:  (1) that any developer of the land must agree to "contract with Certified Business Enterprises for at least 35% of the contract dollar volume of the project;" (2) that the developer must "enter into a First Source Agreement with the District;" and (3) that the "executed term sheet . . . between the District and the selected developer" must include, among other things, "[a] description of the green building requirements; [a] description of the schedule of performance; and [a]ny other terms that the Mayor finds to be in the best interest of the District").  But the Court does not need to determine whether some of the specific details involved in the execution of this project were truly unique when compared to other large-scale private development because it finds that the ARB's interpretation of the meaning of the term "public work" conflicts with the plain language of the DBA.

*N.Y.*, 1985 WL 167239, at \*5–6 (Dep't of Labor August 23, 1985) ("*Ft. Drum*") (U.S. Army family housing units). Thus, while these precedents might relate to the question of whether a lease agreement could constitute a "contract for construction" under the Act, they do not support the additional necessary finding that the thing being constructed is a public building or a public work. They can be distinguished from the case at hand in two fundamental, determinative ways: public money flowed into those projects (in the form of lease payments), and the buildings were all put to public or government use.

When the last brick is laid, CityCenterDC will be a privately-owned and privately-maintained complex featuring 515,000 square feet of private office space, 295,000 square feet of private retail space, 458 private rental apartment units, 216 private condominium units, 1,885 parking spaces that you have to pay to use, and a private 350-room "boutique" hotel. There isn't going to be a library. This is a far cry from the "post offices and public buildings" that Congress envisioned.

The text, history, and purpose of the Davis-Bacon Act reveal that Congress used the term "public work" in its traditional sense: work that is either funded by public dollars or used by the public, and usually, both. Nothing about the DBA indicates that Congress intended to sweep everything else that might be good for the public in some way into the definition. Thus, the Court cannot sustain the ARB's holding that the privately funded development project at issue here constitutes a "public work."

## B. The DBA's plain language suggests that the Act only applies to government-funded projects.

The ARB decision also fails at the first level of the *Chevron* analysis because the plain language of the Davis-Bacon Act suggests that Congress intended it to apply only to projects procured and funded by the government. The DBA begins: "[t]he *advertised specifications* for every contract in excess of $2,000, to which the Federal Government or the District of Columbia is a party . . . ." 40 U.S.C. § 3142(a) (emphasis added). This implies that the Act is only triggered when the government exercises its procurement powers. There is no question that the CityCenterDC project does not implicate the District's procurement power. Moreover, Congress' requirement that DBA only apply to "contract[s] in excess of $2,000, to which the Federal Government or the District of Columbia is a party" suggests that some amount of government funding must be involved. *Id.*

Even if this language alone does not clearly signal Congress' intent that the DBA was meant to apply to projects funded by the government, Congress also set forth an enforcement scheme in the Act that expressly contemplates that government money will be spent. The DBA requires that every covered contract "contain stipulations that . . . there may be withheld from the contractor so much of accrued payments as the contracting officer considers necessary to pay [DBA-mandated wages] to laborers and mechanics employed by the contractor." *Id.* § 3142(c)(3). In other words, if a contractor who is party to a DBA-covered contract fails to pay DBA-mandated wages, the government can withhold payment from the contractor and pay its workers instead. Obviously the government cannot withhold these funds if it has not first committed these funds. Similarly, the Act anticipates that the government will incur "costs": it

23

provides that the government may terminate any contractor or subcontractor who violates the DBA's wage requirement and that the offending "contractor and the contractor's sureties shall be liable to the Government for any excess costs the Government incurs." *Id.* § 3143. Again, it is inescapable that the government cannot incur "costs" if it is spending no money. Each of these telling provisions reveals that Congress intended the DBA to address situations where the government was *spending money*, which is plainly not the case here.[18]

### C. The CityCenterDC lease agreements are unlike any other "contract for construction" under the DBA.

It is also not clear that any of the CityCenterDC agreements qualifies as a "contract for construction" under the Davis-Bacon Act.[19] The ARB concluded otherwise because some lease agreements have qualified as "contracts for construction" in other cases. AR 3241–42. In addition, the federal defendants and intervenor-defendants rely on a 1994 opinion by the Department of Justice's Office of Legal Counsel ("OLC") that examined the *Crown Point* decision and, in that context, stated that a lease could qualify as a DBA-covered "contract for construction." AR 2769–84. But in each of these cases and the OLC opinion, the government

---

[18] Defendants argue that other portions of the DBA's built-in enforcement scheme – a private right of action for workers against a contractor and its sureties, and a three-year debarment of offending contractors from government contract awards – undercut the existence of clear congressional intent that DBA-covered projects involve government funds. Fed. Defs.' Mem. at 33 n.17, citing 40 U.S.C. § 3144(a)(2), (b)(2). The Court cannot see, however, how the provision of a private right of action for workers – the intended beneficiaries of the statute – is relevant to the question of whether Congress intended the DBA to apply to government-funded projects. And if anything, the debarment provision provides a further indication that Congress intended the DBA to apply when the government exercises its procurement power.

[19] Federal defendants contend that "each of the contracts entered by the District and CCDC" constituted a "contract for construction" under the DBA. Hr'g Tr. at 7.

was the *lessee*: the leases in question called for construction that would be rented, used, and occupied by the government. *See* AR 3240–41, citing *Phx. Field Office*, 2001 WL 767573, at *1 (BLM storage facility); *Crown Point*, 1987 WL 247049, at *1 (VA outpatient clinic); *Ft. Drum*, 1985 WL 167239, at *5 (U.S. Army family housing units). Since the District will neither use nor occupy CityCenterDC, and it will receive – not pay – the rent, all of these contracts are distinguishable.

The *Turnage* opinion illuminates the key distinctions. *See Turnage*, 705 F. Supp. at 6–7, *aff'g Crown Point*, 1987 WL 247049, at *1. In *Turnage*, the court upheld the decision of the Wage Appeal Board ("WAB," the ARB's predecessor) that the *Crown Point* lease was a "contract for construction" under the DBA. *Id.* The underlying WAB decision dealt with a lease between the Veterans Administration and a private developer that called for the construction of a VA outpatient clinic that would serve "about 43,000 patients annually," and was "to be leased by the VA from the developer for 15 years with an option . . . for 5 years more." *Crown Point*, 1987 WL 247049, at *1. Applying the *Chevron* framework, the *Turnage* court first determined that Congress had not spoken to the precise question of whether the DBA's "contract for construction" requirement encompassed "government leases." 705 F. Supp. at 6. The court then found no indication "that Congress intended to restrict [the DBA's] application to contracts where 'construction' is the only element of the contract." *Id.* In conclusion, the court found that "[i]n the absence of contrary evidence of Congressional intent, it is reasonable to conclude that the Act was meant to apply to contracts in which construction is more than an incidental element." *Id.* at 7.

This opinion, like the others cited by the ARB, is both distinguishable and not binding on this Court. The lease in *Crown Point* involved an agreement between the government and a private developer to build structures for the use and occupancy of the government, which the government would in turn pay to lease.[20] 1987 WL 247049, at *1. Although the *Turnage* court found the statutory term "contract for construction" to be ambiguous, it did so when the "precise question at issue" was the application of the DBA to a lease involving the flow of funds from the government to a private developer. *See* 705 F. Supp. at 6. Thus, even if *Turnage* were binding, it would not compel the Court to conclude that Congress was not clear about whether a lease agreement for the construction of buildings that the government will neither use, nor occupy, nor pay for could be a "contract in excess of $2,000," pursuant to "advertised specifications," under the DBA. Moreover, even if the leases in this case did qualify as "contracts for construction," the Court has found that they do not call for the construction of "public buildings or public works." Therefore, while the Court questions whether the "contract for construction" requirement of the DBA has been met in this case, it need not decide the issue.

II.    **Even if the term "public work" were ambiguous, the second step of the *Chevron* inquiry indicates that the ARB's decision was unreasonable.**

The Court finds that Congress clearly did not intend the DBA to apply to private development like CityCenterDC. But even if one were to conclude that the statute is either silent or ambiguous on the question to be decided, the ARB's decision cannot be sustained because its interpretation of the term "public work" was arbitrary and capricious. Furthermore, the Court

---

20    The same is true of *Phoenix Field Office* and *Ft. Drum*. *See Phx. Field Office*, 2001 WL 767573, at *1; *Ft. Drum*, 1985 WL 167239, at *5.

would owe little deference to the ARB's reading of DOL's regulation because the regulation merely restates the judicial definition of "public work" in *Irwin* and *Peterson*. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1085 (D.C. Cir. 2001) (stating courts "owe no deference to an agency's reading of judicial orders or decisions"); *DOJ v. Fed. Labor Relations Auth.*, 266 F.3d 1228, 1230 (D.C. Cir. 2001) (same). Finally, it is not clear that DOL's regulation defining "public work" applies to the District in the first place.

### A. The ARB's interpretation of "public work" was unreasonable and the Court owes it little deference.

The ARB's determination that CityCenterDC was a "public work" is unreasonable for the same reasons that it violates the plain language of the DBA. The ARB's decision does not accord with its own precedent or with the plain language of its own regulation. Moreover, as the ARB itself has acknowledged, the regulatory definition of "public work" merely paraphrases the judicially supplied definitions of *Peterson* and *Irwin*. *See supra* n. 16. Consequently, the Court owes what is simply a legal interpretation, rather than an application of specialized agency expertise, little deference. *See Am. Bioscience*, 269 F.3d at 1085.

The DOL regulation defining "public work" for purposes of the DBA states:

The term public building or public work includes building or work, the construction, prosecution, completion, or repair of which, as defined above, is carried on directly by authority of or with funds of a Federal agency to serve the interest of the general public regardless of whether title thereof is in a Federal agency.

29 C.F.R. § 5.2(k). In reaching its conclusion that CityCenterDC constituted a "public work," the ARB relied on three prior administrative decisions interpreting this regulation in the context of government lease agreements: *Ft. Drum*, *Crown Point*, and *Phoenix Field Office*. AR 3242–

27

44.   But the ARB's conclusion that these cases provided support for its decision was, itself, unreasonable.   None of these cases supports the finding that CityCenterDC is being constructed "to serve the interest of the general public."

      i.    *Ft. Drum*

In *Ft. Drum*, the WAB held that the DBA applied to an agreement between the United States Army and a developer for the government to lease privately built housing units for use by military families.   1985 WL 167239, at *7.   The Army had issued RFPs for contracts to lease these units near Fort Drum, New York in accordance with the authority and framework set forth by section 801 of the Military Construction Authorization Act of 1984, 10 U.S.C. § 2828(g) (1984).   *Id.* at *1, *3.   The WAB found that the construction of any section 801 housing would be "carried on directly by authority of" the government because:   there would be a competitive bidding process involved in selecting the developer; the military had the option to "operate and maintain" the facility itself; the housing would be built to Department of Defense specifications; and Congress would ultimately approve any lease agreement.   *Id.* at *6–*7.   The Board then concluded that the section 801 housing "serve[d] the public interest" because it was "built at the request of the military departments for exclusive occupancy of military families on or near military installations which have a validated need for such housing."   *Id.* at *7.   The fact that the housing might revert to private use at the expiration of the twenty-year lease did "not change the fact that it [was] being constructed expressly for the public benefit and use and [would] be used for that purpose for at least 20 years," or otherwise "diminish the 'public' nature" of the construction.   *Id.* at *7.

ii.    *Crown Point*

In *Crown Point*, the VA solicited bids seeking a private contractor to build a facility for a VA outpatient clinic.  1987 WL 247049, at *1.  The solicitation specified many details about the desired construction, including the number of stories, the overall square footage, the location, and "requirements for the ceiling, floors, walks, ramps, restrooms, and elevators."  *Id.*  Although the facility would be privately owned, the VA would lease it from the developer for fifteen years, with an option to renew for an additional five years.  *Id.*  The VA would also be responsible for maintaining the facility during that time.  *Id.*  The WAB held that the building was being built "by authority of" the VA because of the methods by which the VA solicited and awarded the contract, and because there was no evidence that a private developer would have undertaken the project without VA's involvement.  *Id.* at *4.  Then, the WAB found that the building "serve[d] the interest of the general public" because it was "being built at the request of the VA and for the sole purpose of serving the needs of the VA in furnishing outpatient clinical care to veterans." *Id.*  "Certainly," the Board determined, "construction of this clinic serves the public interest in providing clinical care to veterans."  *Id.*

Finally, the WAB stated that "[t]he fact that the building cannot retain its public character upon the expiration of the lease in 15 to 20 years . . . does not change the fact that it is being constructed [*expressly*] for the public benefit and will be used for that purpose during that period of time."  *Id.* (alteration and emphasis in original).    It noted that there were "no assurances that this building, constructed for a specific purpose with no entrepreneurial risk, [would] ever be placed in the private sector."  *Id.*  The Board concluded that "the nature of the building, the purpose for which it is being constructed and the length of time that the

Government will occupy the building (15 to 20 years) definitely makes it a project which 'serves the interest of the general public.'" *Id.*

    iii.    <u>*Phoenix Field Office*</u>

The facts and reasoning of *Phoenix Field Office* closely resemble those of *Crown Point* and *Ft. Drum*. In that case, the BLM solicited bids for a storage facility to be leased in Phoenix, Arizona for fifteen years, with the option for the government to cancel after ten years. 2001 WL 767573, at *1. The solicitation specified in "significant, particularized detail" the parameters of the project, including location, size, and architectural design. *Id.* The BLM solicitation also anticipated that the DBA might apply to the project. *Id.* at *2. The ARB found that the building was a "public building" under section 5.2(k) because it was being built "for the public's benefit, *i.e.*, BLM's occupancy," for ten to fifteen years. *Id.* at *7. The ARB emphasized that its "focus must be on the substantive use of the property under the contract itself." *Id*.

    iv.    <u>CityCenterDC</u>

CityCenterDC is being constructed pursuant to a lease between the District and a private developer. It is true that, as in the prior cases, the governmental entity initiated the project, set out detailed requirements for design and construction, and retained approval rights over many aspects of the project. But the similarities end there. The WAB and ARB determined that each of the buildings in *Crown Point*, *Phoenix Field Office*, and *Ft. Drum* "served the public interest" because upon completion, they were to be used, occupied, and leased *by the government itself.* Indeed, according to the ARB, the intended use of the structures was the determining factor. *See Phoenix Field Office,* 2001 WL 767573, at *7. And each of these cases involved both public funding as well as public use.

The CityCenterDC development will be wholly financed by private developers and investors, and, in the exact reverse of the *Ft. Drum*, *Crown Point*, and *Phoenix Field Office* situations, will be privately used and occupied for ninety-nine years. Moreover, here, the District is the lessor of the land, receiving rent payments, while in the ARB's cited cases, the government was the lessee. And unlike any of the buildings in the administrative cases, the CityCenterDC development is being constructed with both "entrepreneurial risk" and for the express purpose of being "placed in the private sector." *See Crown Point*, 1987 WL 247049, at *4.

The ARB acknowledged these distinctions, but minimized them. While recognizing that the projects in the three administrative cases "primarily benefitted the public," the ARB insisted that CityCenterDC was a "public work" because it "in some manner 'serve[s] the public interest.'" AR 3244. When asked to elaborate upon this "in some manner" test, the Department informed the Court at oral argument that a "public work" need only "serve the interest of the general public *enough*." Hr'g Tr. at 38. But this amorphous interpretation is unworkable, and therefore arbitrary and capricious, because it has no defining standards to be applied, and it is without limits. Congress enacted the DBA to apply to one specific type of construction, but virtually any project might serve the public interest "in some manner," particularly if providing job opportunities or tax revenues for the District satisfies that requirement.

In reaching its decision in this case, the ARB noted that, in *Ft. Drum*, the fact that the privately-owned, government-leased facility could revert to private use at the expiration of the lease did not make it any less "public." *Id.* But that section of *Ft. Drum* – as well as similar sections in *Crown Point* and *Phoenix Field Office* – underscores the proposition that the ARB's "focus must be on the substantive use of the property under the contract itself." *Phx. Field*

31

*Office*, 2001 WL 767573, at *7. Applying that reasoning here demonstrates the flaw underlying the ARB's conclusion: the CityCenterDC project's "substantive use" under the terms of the ninety-nine year leases will be private.

There is no question that CityCenterDC has the potential to generate significant public gains for the District and its residents, including increased employment opportunities, a set of more affordable housing units, a revitalized city center, and lease and tax revenue for the government. Many of these benefits are common to all private development and some may be unique to CityCenterDC. But the planning for a "win-win" outcome did not alter the project's fundamental character and transform it into a public work; the promise of job creation and tax revenue is the very thing that motivates local officials to attract more private development to their cities. The ARB's conclusion that the private CityCenterDC project is a "public work" because of its incidental public benefits was arbitrary and capricious, and it must be set aside.

**B. The DOL's regulation may not even apply to the District.**

The Court also notes that it is difficult for the agency to hang its hat on its reading of its own regulations, specifically 29 C.F.R. pt. 5, when those regulations may not even apply to the District in the first place. Section 5.2(k) defines the "public works" to which the Davis-Bacon Act applies to include "building or work, the construction . . . of which . . . is carried on directly by authority of or with funds of a *Federal agency* to serve the interest of the general public regardless of whether title thereof is in a *Federal agency*." 29 C.F.R. § 5.2(k) (emphasis added). And the federal defendants do not dispute that in 1983, the DOL specifically amended the regulations in 29 C.F.R. pt. 5 to exclude the District from the definition of the term "Federal agency." *Compare* 19 C.F.R. § 5.2(j), 29 Fed. Reg. 95, 100 (1964) (including the District in the

32

definition of "Federal agency"), *with* 29 C.F.R. § 5.2(c), 48 Fed. Reg. 19,540 (1983) (excluding the District from the definition of "Federal agency"). Despite federal defendants' insistence that "nothing in the [DOL's] rulemaking history establishes that the revised definition of 'Federal agency' . . . was a recognition that the District was no longer subject to the Department's rulemaking authority," Reply to Pls.' Opps. to Fed. Defs.' Cross-Mot. for Summ. J. at 19 [Dkt. # 53], it is inescapable that the express language of the regulation once included the District, and now it does not. Since the Court has found that the project is not a public work in any event, the fact that the District has been carved out of the very regulation on which the ARB relied only underscores the unreasonableness of its determination.

## III. Intervenor-defendants' counterclaim is moot.

Intervenor-defendants brought a counterclaim against the District and CCDC, alleging that plaintiffs' failure to incorporate DOL prevailing wages into the CityCenterDC contracts pursuant to the ARB's decision constituted a deprivation of their rights in violation of 42 U.S.C. § 1983 (2012). Intervenor-Defs.' Countercl. at 13. Since the Court has found that the ARB's decision cannot be sustained, intervenor-defendants' counterclaim is now moot.

**CONCLUSION**

Because the Court finds that the language of the Davis-Bacon Act plainly does not apply to the CityCenterDC development, the Court will grant the District's and CCDC's motions for summary judgment, and deny the federal defendants' and intervenor-defendants' cross-motions for summary judgment. In addition, the Court will grant the District's and CCDC's motions for summary judgment on the intervenor-defendants' counterclaim, as it is now moot.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 31, 2014